Good morning, Mr. Newdow. Good morning. I'm Mike Newdow. I'm representing the plaintiff Olga Perrier-Bilbo, and I would like to request four minutes for rebuttal. You may have them. Thank you. Prior counsel noted that immigration law accelerates the aging of judges. It also accelerates the aging of at least this attorney. I'm actually only 23 years old. Take that into consideration. Thank you very much. Sometime in 2009, Ms. Perrier-Bilbo contacted me. She had heard that I do some religious freedom issues, and she had a problem with religious freedom in terms of the immigration oath, which has to help me God at the end. And she did not feel comfortable participating in an oath that has to help me God. She doesn't believe in God. And so I decided to take the case. I will note I would like to just raise the issue about the, what I think is, an egregious due process violation on the part of the Director Hayden, who I wrote to her when Ms. Perrier-Bilbo contacted me. I wrote to her. I said, hi, I'm representing this plaintiff. She did not respond. A little over two months later, I wrote again, hi, I'm representing this plaintiff. She didn't respond. A little more than two months later, I wrote a third time, said it's certified, return receipt requested, and she didn't respond. And then five months after that, she says, oh, you didn't respond to my letter to you, and we're going to abandon your case, and you can start over. I think that's what happened. Leave that aside for a moment. Would you agree with me that the cases that have been decided by a Supreme Court on the use of these type of oaths bind this Court? No, I wouldn't, because those are all dicta, and the dicta that they have are nowhere near as strong and as righteous as the dicta that they have that say things like the government may not lend its power to one or the other side in controversies over religious dogma, that just as we subject to the most exacting scrutiny laws and make classifications based on race, so, too, we strictly scrutinize governmental classifications based on religion. Are you telling me that there are cases from the Supreme Court upholding the use of the So Help Me God? I'm not aware of any case that upholds So Help Me God. And in this case, too, this is much more like Lee v. Weissman. This is a ceremony that the Supreme Court talks about the wonder of the ceremony, participating in that ceremony as this is. These are people who come to the nation, like my client, wishing to become American citizens because of the promises of equality, and then the first thing they do, they're told that they're not equal as part of the oath to become a citizen. Well, they have provided a couple of alternatives. Right, and the alternatives, I would point out, are just like I read that you have a book about the Supreme Court in Puerto Rico, Separate and Unequal. You read it? Well, no, I didn't have the time, unfortunately. I wish I had. But just as you notice that separate but equal, here you have not only the figurative separate but unequal, you have exactly Plessy v. Ferguson. I mean, it's astounding. The government of the United States says, oh, here's what we can do. You're of a different religion. We're going to give you a separate railroad car. Go take your oath there. I mean, it's extraordinary. The only difference is in Plessy v. Ferguson, nobody said that Mr. Plessy had to say, so help me, white people, as he entered the railroad car. And they make it like it's a big deal. Look how wonderful we are. You don't have to say it. Mr. Plessy didn't have to say, so help me, the Caucasian race. He was allowed to go and he was forced to go into another car. And my client, because of her religious beliefs, is being forced to go into another courtroom to take her oath. Why can't she enjoy this magnificent ceremony that she wants to participate in? Why is she told that as you start your American citizenship, you're like some pariah, some second-class citizen. Go over there. You said that I know U.S. Supreme Court cases. What about the recent case of American Legion versus American Humanist Association? Decided June 20th of this year. As I say, in dicta they mention things like... Pure dicta, yes. The whole point about the cross was that it was a symbol not of religion. It was a symbol of death and taking people, and this is what we put out on graveyards. And that was the key part of the action. And in fact, you had people like Justice Breyer saying, if this happened today, this would be no good. We only allow it because it's been there and because we can look back to the origin and find that it was not about religion. It was about just paying respect to the dead. I thought that case holds, where you have historical use of a certain symbol accepted more or less by society generally. That legitimizes it from the constitutional standpoint. In certain circumstances, for instance in that circumstance, when they are agreeing that this was not done for religion. It was agreeing because this is a symbol that we use to memorialize the dead. And that was the whole... Why is that the situation in this oath? Because this was not. This was clearly for getting God in our government. We've had monotheistic supremacists putting God in our government. It took place, according to the defense, this took place in the 1950s. When all of a sudden, after almost 200 years of the United States' history, we put a prayer room in the Congress of the United States. We put under God into the Pledge of Allegiance. We're making God we trust our national model. We're mandating God we trust onto every coin and currency. Please put it in your own perspective. Make believe we said, instead, in a case... All of a sudden, in the 1950s, it was Ethiopia and not Russia that were fighting. And we say, okay, so help us. Our national model is going to be in the Caucasian race we trust. And we were going to have a white room in the racial... We could do like Virginia called it. Excuse me. You mentioned currency. How long has in God we trust been part of our currency? It was first started in 1864. It wasn't mandated until 1955. And it was first on all coins and currency in 1967. So it's a relatively late occurrence. And, by the way, when that occurred, the Supreme Court has never heard this, but it occurred the director of the Mint, in five consecutive official Mint directors' reports, placed things like, we claim to be a Christian nation. Our national coinage should declare our trust in God, in him who is king of kings and lord of lords. So I think that that's quite different from Bladensburg, where we say this is just a symbol for people who die. This is clearly to advocate not only for monotheism, but for Christianity, as clear as you could make it, in the official Mint director's report. And I think it's critical. You know, we keep looking back and say, oh, this has been here for a long time. The only oath in the Constitution of the United States, the oath for the president, does not have to help me God. And what is really extraordinary is that the first act of the government of the United States, the first act, statute number one, was the Oath Act. The members of Congress had to come up with an oath for themselves to take. 34 of 36 had already taken an oath that was modeled on New York's oath, where they took their oath, which had in the presence of almighty God, and so help me God. The very first act of the government of the United States never mentioned in a federal case on the Establishment Clause, how that can be, I don't know, it says specifically they took out both references to God and there's no so help me God in the oath that they created for themselves, pursuant to Article VI, which is no religious test shall ever be required as a qualification to any office or public trust under the United States. So what you see here is something that's completely contrary to the principles, contrary to the text of the Constitution, and it continues on. And what we do is we say to people, you know, this is your second class citizens, come to our country, but go take your oath here, we'll do you a great favor. Go take your oath separate from all the rest of your citizens because of your religious beliefs. If there are cases of the Supreme Court that sustain the use of this language, what does that do to your case? That sustains, so help me God, specifically, that there was a case in which that was at issue or in dicta? In which the Supreme Court has... I'm trying to pick my words. Okay. I suppose legalized or constitutionalized this language. I don't... What does that do to your case? Well, if they said it, I'd lose the case, there's no question. Except under RFRA. All right, that would be under the Establishment Clause. But we have a RFRA claim here and that, you know, under the doctrine of constitutional avoidance, you're not going to rule on this in the Establishment Clause. We're going to look at RFRA. And RFRA says that you have to, and it's required, it's written into the statute, that you have to rule and protect my client to the maximum extent permitted by the terms of this chapter and the Constitution. And you can't tell me it's not permitted to get rid of in God, so help me God, in the oath when, in fact, the only oath in the Constitution doesn't have it, when the first act of Congress was to remove it, and when in the statute itself that says you have to have these words, it says, you don't have to do it if it bothers you on the basis of religion, which shows that they had religion in mind when they put this in there. So I can't imagine how you can... Your argument under even RFRA suggests that the alternatives are not good enough, that this is not a situation where she's being denied the right to become an American citizen. Correct. She's not being deprived of that liberty interest. But you're saying that either having a separate swearing-in or just silently, or remaining silent for that portion of the oath is not a suitable alternative. And if Homer plus E, we said, you know, it's okay, you don't have to say, so help me, Caucasians, would that be okay? All of a sudden, if we had to help me, Caucasians, to get onto the railroad car? The Supreme Court... I don't disagree with some of your logic, except the Supreme Court seems to be suggesting that God doesn't really mean God. In a lot of these cases recently, when we say God, we should swap out symbolism. In the Bladensburg Cross case, I agree. But that's not in other cases. And we have no data here to suggest that they would apply that here in this case, except some dicta where they've never been briefed. They don't know that when they said, you know, put, in God we trust, on the coins, that the director of the men put in his official report, I doubt they have any knowledge of this, that we claim to be a Christian nation, and we should be worshipping Jesus, which is what, essentially, he said. So I think it's very different here. Let us at least get to the Supreme Court and let them know. If they want to... If they are so blind that they want to redo Plessy, they want to redo Firedale v. Illinois, they want to redo Korematsu, and they're not smart enough to learn that when you have flagrant discrimination, facial discrimination, repeatedly exemplified through the government, then that's our country, unfortunately. But maybe they actually... I don't have so much... You may continue, but I'm going to ask you another question anyway. Go ahead. So I have more faith in the Supreme Court than those who think that they're that bigoted, that they're that blind to the plight of atheists in this country. In the case that I've been referring to, recently decided, Lindell's opinion makes reference to in Marsh v. Chambers, and he says, the Court upheld a state legislator's practice of beginning each session with a prayer by an official chaplain, finding it highly persuasive that Congress for over 200 years had opened its sessions with a prayer and that many state legislatures have followed. Correct. And then we came with Greece recently, which modified Marsh, and in Greece they specifically said, the Supreme Court, Justice Kennedy, specifically placed in that that this is different because atheists could get the equal rights of anybody else. You can't say atheists have equal rights. We don't have a right. Well, as a matter of fact, the next sentence he talks about Greece, and he says the following, the Court in the town of Greece reasons that the historical practice of having, since the first Congress, chaplains in Congress, show, quote, that the framers considered legislative prayer a benign acknowledgment of religion's role in society. And he goes on. And maybe he says it's all right. He says it's all right, but in Greece, as I say, the Supreme Court changed. They didn't say this in Marsh v. Chambers. They specifically pointed out that atheists have the same opportunity to stand in front of that board and to talk about God not being there. We don't have that opportunity here. There's no oath that ever is asserted that says, and God is a myth. And imagine what you would think that the people in hobby lobbies would say if we had, in God with his mouth, myth. They'd go crazy. And the fact that you would do it for 200 years if suddenly the atheists got power in this country, you know, would that all of a sudden make that permissible? I think not. And Justice Breyer again said, you know, we wouldn't allow that today. But somehow it's gotten, and we only, and the Bladen is a very cross case, when we can look back and say that it didn't start on a purely religious basis. And so I think that was changed quite strongly. Thank you, Counselor. Thank you. Mr. Stewart. Good morning. Good morning. Thank you, Your Honor. May it please the Court. I'm Scott Stewart on behalf of the United States. As reflected in some of the colloquy that's happened already, Your Honor, is my friend's main quibble is really with the Supreme Court's precedence in its approach to deciding these cases, as well as this Court's precedence in a number of contexts. It's notable, for example, that my friend pays very little attention to this Court's decision in Hanover School District, which, particularly combined with the Supreme Court's later decision in town of Greece, pretty much dooms, definitely dooms, the bulk of his claims. Hanover School District involved a context of school children and a state law that called for the recitation of the pledge with children present. They weren't, it was voluntary to participate in the pledge, but they had to sit at respectful attention. We have a similar situation here, Your Honors, where if somebody objects to a certain, to this critical phrase in the oath emphasized by my friend, they don't have to say it. They can just let others who wish to say it, say it. The plaintiff here is an adult, does not face the kind of pressures that the Court has at times recognized in the school context. Pretty much end of case under Hanover, particularly when it's combined, Your Honors, with town of Greece. In that case, of course, the Supreme Court said, look, we don't need to go into the other tests, the Lemon Test, the Endorsement Test, when we have history that shows that a practice is quite permitted. That's page 577 of town of Greece. And a number of practices show that, so help me God, has a very strong, long-standing historical pedigree that fits within the tradition of lending gravity to a proceeding seriousness, the sort of things that Justice Kennedy called out. I think a useful collection appears in then-Judge Kavanaugh's opinion, separate opinion in Newdow v. Roberts from several years back, Your Honor. This is cited in our briefs, but then-Judge Kavanaugh recounted that, look, the first Congress, the same Congress that drafted and approved the First Amendment, mandated, so help me God, in the oaths of office for federal judges. State constitutions at ratification had the words. Many still have them today. The Supreme Court has numerous times, at least in dicta, suggested that, so help me God, is definitely a permissible phrase. So I think all the, just the teaching of talent of Greece combined with this Court's decision in Hanover dooms the Establishment Clause claim, and I think it is noticeable. What does so help me God mean? I'm sorry, Your Honor? What does so help me God mean? Your Honor, I'm not sure that the Court has inquired exactly how to say that. This Court has recognized, I believe in Hanover, that, look, phrases like, I believe it said this with respect to under God in the pledge, you know, it has some religious content. The Court hasn't dug deeper into that, you know, too much. I think what it said in town of Greece is even more sectarian uses of God, you know, Holy Father, Jesus Christ, those sorts of things. Use of those could be, that are even more particularized, and I'd say less encompassing, could be fine, and in those cases were fine, but I'd be careful to define it with too great a particularity. With respect to the free exercise claim, Your Honor, I think a similar theme with existing precedent is a big wall for my friend. Again, the Hanover School District case is a very, combined with this Court's decision in Parker, is a very, very insurmountable barrier for him. This does not fall under any of the four categories of Parker. The District Court was right about that. Mere exposure to a phrase doesn't impinge on someone's free exercise. The plaintiff here does not have to say the phrase, and she's been given even a further opportunity to avoid hearing the phrase. So, under those precedents, particularly after Greece, where, again, the Supreme Court recognized that, you know, in the context of, you know, this larger gathering of adults, this wasn't kind of a coercive thing. I mean, people wouldn't, people's leaving wouldn't be seen as a part, people's staying wouldn't be seen as exceeding to the phrase or affirming it. On the RFRA claim, Your Honor, the point I'd emphasize here is that this is really a situation where the government has gone out of its way to accommodate the concerns of people who do not want to say this phrase. They don't have to say the phrase. If they don't even want to hear the phrase, they have an option here. So they really don't face a substantial burden. Some of the cases my friend cites, he homes in on Hobby Lobby. Hobby Lobby involved a situation where the plaintiffs there were concerned that they were facilitating conduct that they found to be immoral. Here, Ms. Perry-Abelo is not obliged to somehow facilitate somebody else's saying of the phrase. Again, she doesn't have to say it. It's a different situation, and when you have dual accommodations, you really have an opt-out situation that satisfies relevant principles. As I understand the plaintiff's argument, they're basically saying that her rights are being affected by the fact that other people are being forced to use this oath. Am I off track here? I think that she focuses it, as I understand it, Your Honor, she focuses more on being exposed to a phrase in a ceremony that she finds objectionable. I don't... No, I don't think that's the case because one of the alternatives is to have a ceremony all by herself without that phrase being used. So as I understood her argument, at least some of her argument, was that this ceremony, even where she wasn't present, affected her rights. And the question that I'm leading to is what is her standing for purposes of arguing that situation? And my response would be I didn't understand the argument that way, in part, I think, Your Honor, because that would raise real standing questions. It doesn't have to be present. It doesn't have to say it. It doesn't have to hear people say it. Those would raise real standing questions. I took her argument to be, and I believe that this is the one that the district court rejected, is she doesn't have a claim to make it so other people in her presence don't say it. I understand she wants to be in a ceremony where she doesn't have to hear it at all because she finds it offensive or violative of the law. So I do think, Your Honor, though it hasn't been briefed and I didn't take my friend to be making that sort of claim, that there would be real standing issues with that kind of a claim. But I do think it also points out a real problem here, Your Honor, is that this is quite a case where the plaintiff is not being forced to say something. She's not being forced to hear something. And what she wants to do is make it so others who don't find the phrase objectionable and something that has a long historical pedigree, even though it may cause offense and does cause offense to some, something with a long history and tradition, is just acceptable and permitted and understood to be consistent with the Constitution in this country. The last couple of points, Your Honor, I'll just hit the remaining claims briefly. Equal protection, again, I think Hanover School District really dooms this claim. The court was pretty punchy in there in just explaining that, again, with the pledge statute there, it didn't require different treatment of any class of people, religious or non-religious, based on religious beliefs. It didn't give preferential treatment. Instead, as with the regulation here, it applied equally. It gave everyone the equal right to participate or not to participate. It could be for any reason, religion, non-religion, good conscience, that kind of thing. So here, again, that reasoning, just replacing the relevant words of pledge statute, essentially, with regulation applies with very, very strong force here. Lastly, and briefly, Your Honor, the two remaining claims, there's not much to the procedural due process claim. The district court was pretty, found that a pretty ready claim to reject. There's just no cognizable interest in having a ceremony with an oath of one's choice. Here, in any event, I think it's hard to see that claim as much different the way it was pleaded, I think, from the other claims. So with the falling of the other claims, there's not much left to resurrect here. But I would note that in a procedural due process claim, we're talking about notice and opportunity to be heard. And I think it's hard to get around the fact, for my friend, that the plaintiff did have notice about the relevance of not attending the oath ceremony, had options, and was heard. So I think that's, for multiple reasons, a failed claim. And finally, Your Honor, and again, this is quite a brief one, is that the remaining due process argument with respect to the reimbursement claim, it just wasn't adequately pleaded. It wasn't adequately presented. It was something that was put into the prayer for relief. There wasn't notice given of it in the claims. The district court clearly saw it that way when he explained in his electronic order in response to the post-judgment motion, like, look, I rejected all your claims. There's no relief for you, so no reimbursement left. And that's kind of where we are. It's notable that my friend, in his brief, when he's bringing up how this claim was brought up, he notes that, you know, it's in his prayer for relief. And then he quotes transcript snippets at the end of the hearing in this case, which really goes to show this was not really something that was pressed in this case as a claim. So there's, you know, and it's the kind of thing where my friend has suggested that the facts are somehow certain and undisputed, and, you know, we certainly wouldn't concede that, and it wouldn't be the sort of thing appropriate to consider at this stage of the case. In closing, Your Honor, I would emphasize again, as I started, the plaintiff's quibble in this case is really with the Supreme Court's precedence, its approach to cases raising these various kinds of claims, as well as this Court's precedence and its holdings as to various claims of this sort, and, indeed, with claims with very similar on-point facts whose holdings apply with strong force and calls for affirmance of the District Court's judgment. If there are no further questions, I ask that the judgment be affirmed. Thank you. Thank you, Your Honor. The focus seems to have been on the Establishment Clause, and I'd like to turn the focus to RFRA because, again, constitutional avoidance and because we have an overpowering RFRA claim. The Supreme Court stated in its last RFRA case, the Trinity Lutheran Church, this Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order. We know there's no state interest at all because, as I said, in the Constitution, the only oath doesn't have so help me God, and the first act of Congress involved removing so help me God, and the statute itself and their solution is go over there and you don't need so help me God. So, so help me God doesn't have to be there. So the only issue here is whether or not there's a substantial burden. You're defining the benefit as the right to be present at a multipurpose swearing-in or a swearing-in involving numerous people. Right. The generally available... As opposed to the benefit being the conference of citizenship. Exactly. I think you're absolutely correct, and that is a benefit as was made clear by the Supreme Court in Lee v. Weissman. It said this is a huge issue for that child as she becomes an adult and graduates from high school, and to tell her that she has to go anywhere or shouldn't be there is just a formality. This is something that's important just the same way the director of the USCIS, the previous director, Leon Rodriguez, he said this is a momentous, great occasion. Imagine having that momentous, great occasion versus being told to go over someplace else and go do it by yourself because you're not a real American, you don't believe in God, which is the message that is being sent to her. I mean, imagine being told do it by the color of your skin, just as we subject... They say that. They're willing to give the oath. They're willing to give the oath as she was Right. Homer Plessy, you know, you can go to Covington, Louisiana, just go in a different railroad car. What's the big deal? Isn't that egregious? Isn't that what the whole point of the Equal Protection Clause is about? And here we're doing it on the basis of religion, exactly what we said we can't do on race. And the only reason is because we in America now say, you know, that what we used to do to black people is horrific, and we don't want to do that anymore. But what we do to atheists, it's fine. Look, we have in God our national motto. As a badge of honor, look, we have in God we trust as our national motto. And I think... I think the decisions of the Supreme Court have something to do with the outcome. Sorry, I missed that. I think the decisions of the Supreme Court, which you don't think exist, have something to do with the outcome. In terms of Plessy? And Brown vs. Board of Education? I'm going to throw the question. Okay. So, the issue, I think, the best way to look at this is to compare the current status in terms of RFRA is to look at the Hobby Lobby case. Look at those plaintiffs. Those plaintiffs said, look, we don't want to support abortion in any way. I don't know what makes that religion. The Supreme Court says, it doesn't matter what you think of what it does. They think it has to do with religion, right? It was one... I mean, think of the percentage of their... They're paying for an insurance policy to cover everything, strokes, broken bones, whatever, and there's this minuscule part that's going to go toward a contraceptive, right? Four out of 20 may, we don't even know if they do, may cause an abortion as opposed to just failure to release an ovum, right? The Supreme Court said, and the defense said, look, look how attenuated this is. I mean, this is ridiculous. This isn't even close. They don't even know what's going to happen. The woman herself may not even know she was ever pregnant if, in fact, it does cause an abortion. They said, it doesn't matter, right? The quote was, and I come, which I lost right here, sorry. The question that Rick... Why does the naturalization oath in its current form substantially burden your client's religious belief? Because my religious, my client's religious belief is that you stand up for your religion and if she doesn't she stands up for her religion, right? Which is that God does not exist. And that's been throughout history. People standing up for the denigration of their religion is part of religious exercise. And her religious exercise says, no, I'm not going to let you treat me and my fellow  as second-class citizens. And that's part of your exercise of religion. Your client is basically representing your fellow atheists. She's representing herself. She has a right to know that what she believes is the exercise of religion is to stand up and say, I count just as much as anyone else. As any other religion does. And she says that, you don't have the right to tell me that this is insignificant. This is insubstantial. Just like you had no right to tell Homer Plessy it's insubstantial that you have to go on another railroad car. You're going to Covington. It's exactly the same thing. She says, I want this done according to showing me respect for my religious beliefs. Which is what people in every branch of every form of religion has been protesting for all the time when they're turned into second class citizens or second class people. And she has that option and she has that right and I think that you need to rule. At least give her the option. This is a summary judgment. I'm sorry. Thank you.